**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| MERCURY MISSION SYSTEMS, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> SIKORSKY AIRCRAFT CORPORATION, <br><br> *Defendant.* | Case No. |

## COMPLAINT

Plaintiff Mercury Mission Systems, LLC ("Mercury"), by and through its undersigned counsel, brings this Complaint against Sikorsky Aircraft Corporation ("Sikorsky"), and in support alleges as follows:

## INTRODUCTION

1. This is a straightforward—yet deeply troubling—dispute. The subcontractor delivered critical work supporting the prime contractor on a multi-billion-dollar military aircraft program. The prime contractor not only refuses to pay for that work, but also caused it to balloon in time and cost through its own actions, misrepresentations, and contractual breaches.

2. Mercury thus brings this complaint against Sikorsky, a subsidiary of Lockheed Martin Corporation ("Lockheed Martin"), one of the world's largest defense contractors and a valuable customer to Mercury across multiple defense programs, as a last

and regrettable resort, to obtain compensation it is rightfully owed for work performed. Mercury functioned as a subcontractor to help Sikorsky in its development of the CH-53K King Stallion heavy-transport helicopter to the United States Marine Corps (the "USMC") (the "CH-53K Aircraft Program").

3.    The CH-53K Aircraft Program is a decades-long procurement critical to the USMC's strategic plan to ensure a stable supply of heavy-lift helicopters for transporting troops, supplies, and heavy equipment in battlefield environments.  The Program is intended to deliver up to 99 helicopters over a number of years at a cost of over $10.9 billion.

4.    Sikorsky has been the sole prime government contractor on the CH-53K Aircraft Program since the Program's inception in 2006.  As the prime contractor, Sikorsky is responsible for the development, production, and sustainment of the CH-53K King Stallion, heavy-lift helicopter for delivery to our military – primarily the USMC.

5.    Over the years, Sikorsky issued solicitations (also known as "Requests for Quotes" or "Requests for Proposals") to engage a wide range of major subcontractors and suppliers in support of the Program, including for the development of certain helicopter subcomponents.

6.    Mercury, a leading aerospace and defense contractor with decades of experience providing cutting-edge products and solutions to commercial and governmental customers, partnered with Sikorsky in support of the CH-53K Aircraft Program since the Engineering and Manufacturing Development phase began in 2010.  As is relevant to this

-2-

Complaint in particular, Mercury is the principal supplier and subcontractor for two high-tech software and hardware components: the Data Concentrator Unit ("DCU") and Blade Fold Distributor ("BFD"). The DCU's role is to aggregate and process data from various sensors and subsystems throughout the aircraft, routing information to flight control computers. The BFD is an essential part of the aircraft's rotor fold system. Both components are central to flight control and effectiveness of the helicopter.

7. Developing, producing, and delivering the DCU and BFD components required developing software to operate the hardware, among other things.

8. Sikorsky requested the supplier reuse existing legacy software and testing scripts to the greatest extent practicable to reduce Sikorsky's costs – an instruction premised on the obvious but critical assumption that the legacy software could be repurposed with minimal additional work.

9. Based on that assumption, Mercury submitted fixed-priced bids in response to Sikorsky's solicitation that offered two options: one to develop entirely new software, and another to repurpose Sikorsky's legacy software. Mercury's second option was less costly based on the assumption that reusing existing software would require less time and expense.

10. Sikorsky accepted Mercury's bid and ultimately issued a purchase order selecting Mercury's second, lower-cost option for the reuse of existing software and testing scripts rather than asking Mercury to develop these materials from scratch. By accepting

that proposal, Sikorsky agreed to provide usable legacy source code and testing scripts that could be incorporated into a real-time operating system and to deliver test scripts needed to verify the code's functionality.

11.    The parties fully understood that Mercury's proposal depended on usable legacy code and testing scripts, and that, if Sikorsky failed to provide viable materials, the project would take many more months and millions of dollars more to complete.

12.    But Sikorsky failed to deliver usable code and viable test scripts as expected. For example, its legacy code ran "bare-metal," meaning it interacted directly with the legacy hardware that was to be replaced as part of the project and was not real time operating system ("RTOS") compatible.  Given the code in question was the same legacy code used previously on the CH-35K Aircraft Program, Sikorsky knew or should have known the bare-metal code could not actually be repurposed as represented.  Sikorsky also knew the consequences of such a misrepresentation, as Mercury explicitly forecasted from the outset that the project would take longer and cost more if it could not use existing code as represented.

13.    Instead of taking responsibility for its own failure and misrepresentations that severely undermined Mercury's ability to deliver on schedule, Sikorsky initially blamed Mercury and demanded it cure project delays without remuneration for the additional time and effort.  The parties eventually agreed on a new schedule – and scope of work – that Sikorsky approved to cure the issues earlier identified.

-4-

14. Based on this new schedule and scope of work, Mercury continued work on the project, including development of usable code and test scripts. To do so, Mercury had to remove hundreds of thousands of lines of unusable code and to develop tens of thousands of new lines of code. Mercury also modified nearly all the legacy test scripts necessary to confirm the software's functionality.

15. As a result of its hard work – and at substantial cost – Mercury obtained preliminary and critical design approvals for the DCU and preliminary design approval for the BFD and was near completing its critical design review for the BFD.

16. Despite Mercury's performance in line with the parties' agreed upon revised schedule and scope of work, Sikorsky suddenly purported to terminate the parties' agreement for default – over *seven months* after its initial cure notice, long after the parties agreed on a new schedule, and after Mercury met critical project milestones and incurred more than $22 million in costs, including millions to redevelop the necessary software code.

17. Sikorsky's purported termination was improper, and it remains obligated to pay Mercury more than $14 million for the valuable work Mercury performed in support of the CH-53K Aircraft Program. Yet Sikorsky has refused to compensate Mercury.

18. Accordingly, left without any other means to obtain compensation to which it is rightfully entitled, Mercury now brings this suit for damages and all other appropriate relief.

**PARTIES**

19.     This dispute is between a government prime contractor and subcontractor.

20.     Defendant Sikorsky Aircraft Corporation is a subsidiary of Lockheed Martin Corporation – a global aerospace and defense firm.

21.     Sikorsky provides military aircraft and services to the United States Government.  As relevant here, Sikorsky is the prime contractor responsible for developing, producing, and delivering the CH-53K King Stallion helicopter to the USMC.

22.     Sikorsky is a Delaware corporation with its principal place of business in Stratford, Connecticut.

23.      Plaintiff Mercury Mission Systems, LLC, is an aerospace and defense contractor that provides essential components and subsystems for, *inter alia*, military aircraft.

24.     Mercury contracted with Sikorsky as a subcontractor in support of the effort to design, develop, test, qualify, certify, manufacture, inspect, and supply the DCU and BFD for the CH-53K Aircraft Program.

25.     Mercury Mission Systems, LLC, has one member: Mercury Systems, Inc. Mercury Systems is a Massachusetts corporation with its principal place of business in Andover, Massachusetts.

**JURISDICTION & VENUE**

26.     The Court has diversity jurisdiction over this action.  *See* 28 U.S.C. § 1332.

-6-

27.     Sikorsky is a citizen of Delaware and Connecticut because that is where it is incorporated and has its principal place of business.

28.     Mercury is a citizen of Massachusetts because that is the citizenship of its sole member.

29.     Complete diversity therefore exists between the parties.

30.     The amount in controversy exceeds fourteen (14) million dollars, which far surpasses the jurisdictional minimum.

31.     The Court also has personal jurisdiction over Sikorsky because it has its principal place of business in Connecticut, it issued relevant purchase orders in Connecticut, the delivery address listed on the purchase orders is in Connecticut, and the Sikorsky personnel involved in the subcontract were based in Connecticut.

32.     Venue is appropriate in Connecticut because a substantial part of the events or omissions giving rise to Mercury's claims, including contract formation and performance, occurred in Connecticut.  *See* 28 U.S.C. § 1391(b)(1) & (2).

## FACTUAL ALLEGATIONS

### *Mercury Provides Cutting Edge Aircraft Components And Subsystems*

33.     Mercury has produced state-of-the-art products and solutions for our aerospace and defense industry for over forty (40) years.

34.     Mercury employs nearly 2,200 team members globally, many of whom hold Department of Defense security clearances.

35.    Mercury's customers range from commercial companies to government agencies to prime contractors and higher-tier subcontractors on government procurements.

36.    Mercury has contracted and successfully completed projects with virtually all major aerospace and defense contractors, including Lockheed Martin.

37.    Under Federal government procurements, a prime contractor typically obtains a government contract to deliver a final, end product, such as aircraft, and subcontracts with Mercury or other suppliers for essential components or subsystems of the end product.

38.    Mercury produces cutting-edge components for its customers that are highly specialized, compliant with strict specifications, and designed to maintain our nation's miliary supremacy over foreign adversaries.

### Mercury Subcontracts With Sikorsky To Provide Critical Components
### For The Strategic King Stallion Helicopter

39.    Initial concept development for the CH-53K Aircraft Program began in the early 2000s between the U.S. Naval Air Systems Command ("NAVAIR") on behalf of the USMC and Sikorsky, after the Government identified a need to replace and modernize the existing CH-53E Super Stallion helicopter fleet.  Sikorsky has been awarded a number of additional agreements since 2006 relating to the Program, including Contract Number N00019-19-G-0029 in 2019 – an Indefinite Delivery/Indefinite Quantity ("IDIQ") basic ordering agreement between NAVAIR and Sikorsky.  NAVAIR has issued several orders

under Contract Number N00019-19-G-0029 for the production of CH-53K helicopters and related services, including, as relevant here, Order Number N00019-22-F-1147.

40.     The CH-53K King Stallion is intended to advance the U.S. military's heavy-lift helicopter capabilities and represents a critical part of the USMC's strategic plan.  The CH-53K Aircraft Program will ensure a stable supply of heavy-lift helicopters used to transport troops, supplies, and heavy equipment in battlefield environments.

41.     The CH-53K Aircraft Program currently is estimated to deliver approximately 99 helicopters with total program costs projected around $10.9 billion.

42.     Sikorsky has partnered with Mercury as a supplier for a number of opportunities since the Program's inception.  As is relevant to this Complaint, Sikorsky issued a solicitation for two critical helicopter components: a Data Concentrator Unit ("DCU") and Blade Fold Distributor ("BFD").

43.     The DCU collects, converts, and processes data from multiple systems and sensors throughout the aircraft. The BFD processes data transmission for the blades, allowing the rotor blades to be folded in for storage and transport. Sikorsky sought subcontractor support to provide the hardware, mechanical engineering, software development, and system testing for both components.

44.     In the scope of work for the DCU, Sikorsky requested the supplier use "existing, off-the-shelf, fully qualified equipment to the maximum extent possible" and "software algorithms from the CH-53K baseline program."

45. The scope of work further provided the parties will "mutually agree upon Supplier IMS events, which shall be incorporated into the overall Contractor Integrated Master Schedule (IMS)."

46. Similarly, the computer resource requirements for the BFD emphasized that "[t]he reuse of software that has been tested and proven on similar military platforms" was a "major design consideration."

47. Consistent with Sikorsky's scope of work, Mercury's initial proposals, which were submitted on a fixed-price basis, expressly assumed that Sikorsky would provide "the application code, requirements, and verification artifacts for the existing DCU."[1]

48. In its DCU fixed-price proposal, Mercury clarified that the technical pricing assumptions were based on "reus[ing] existing SW development and test cases for application code," with Sikorsky furnishing "existing software requirements, design, source code, test cases[,] and test scripts in native format for the DCU."

49. Mercury's pricing proposal assumed that Sikorsky would provide legacy source code and that the code would be suitable for the needs of the program, including that it would be useful in the operating system's needed architecture.

50. On June 23, 2021, Mercury provided Sikorsky with updated proposals for the DCU and BFD.

---

[1] Initial proposals were submitted by Physical Optics Corporation, a defense contractor Mercury acquired in December 2020. After the acquisition, Mercury became the bidding subcontractor.

51.     In the updated proposal for the DCU, Mercury provided Sikorsky with an option for Mercury to develop the source code for the project ("Option 10b").  This option would allow Mercury to efficiently develop its own interoperable software rather than working from the existing legacy code.

52.     The DCU proposal also clarified that, if Mercury did not receive usable source code, the subcontract would be at risk for schedule delay.

53.     On February 24, 2022, Sikorsky issued Mercury the initial purchase order (Purchase Order No. 4500658457) for the DCU and BFD as a "not-to-exceed" contract while the parties definitized the contract terms.

54.     Sikorsky's initial purchase order recognized the overall proposal value for both components was $22.5 million with a three-year period of performance from February 2022 to February 2025.

55.     Sikorsky's initial purchase order further provided for initial funding at $8.1 million until the parties agreed on a firm-fixed price.

56.     Sikorsky's purchase order incorporated scope of work documents for the DCU and BFD but did not include a detailed schedule.

57.     Under the purchase order terms, the parties agreed to continue negotiating the final terms of the contract with the goal of completing negotiations by April 30, 2022, subject to any mutually agreed extensions.

-11-

58.     While the parties continued to "definitize" the contract terms – that is, finalize the parties' precise contractual rights and obligations – Mercury was obligated to complete the purchase order's milestones.  In return, Sikorsky was obligated to pay Mercury 80% of the not-to-exceed unit price.

59.     Mercury also had to communicate progress on major milestone events and any changes to the IMS through Supplier Data Requirements Lists ("SDRLs"), which Sikorsky would either deny or approve through disposition letters.

### Kickoff, Initial Delays, And Contract Definitization

60.     On March 9, 2022, the parties held a kick-off meeting to discuss project teams, the proposed IMS, preliminary designs for the DCU and BFD, and potential risks of project delays.

61.     As part of the kick-off meeting's risk assessment, Mercury highlighted that failure to provide usable source code that could be incorporated into the DCU and BFD projects as expected would severely impact schedule and cost, resulting in a four-month delay and a $5 million cost increase.  These delays and cost increases would result from the added work required to assess, address, and rewrite the faulty source code to make it work with a RTOS as required.

62.     In the weeks following kick-off, Sikorsky sent Mercury six (6) revised purchase orders as the parties continued to definitize the contract terms.

63. The first revision adjusted the overall proposal value upwards to $25.9 million, and the fourth revision clarified the ultimate delivery date would be determined through the definitization process.

64. Sikorsky also sent Mercury correspondence indicating the scope of work options that it intended to select from Mercury's proposal.

65. Importantly, Sikorsky did not select Option 10b for Mercury to develop the source code from scratch, but instead selected the lower-cost option, which obligated it to provide Mercury with viable, plug-and-play source code as previously promised.

66. Between June and September 2022, Mercury continued to perform under the parties' agreements but immediately began to face unrelated supply chain challenges beyond its control, which it candidly and proactively shared with Sikorsky.

67. As part of negotiating the final agreement, on September 15, 2022, Mercury sent Sikorsky a letter in which it agreed "to incorporate its proposed baseline schedule into the contract with Sikorsky's mutual agreement and understanding that this schedule is no longer achievable due to recent events stemming from supply chain constraints against material orders."

68. In the same correspondence, Mercury also explained that "[b]oth Parties acknowledge that the current impacts to supply chain for material are estimated to cause Mercury to be 6 months late on deliveries on the program, and such late deliveries shall not be subject to any damages."

69.     Sikorsky subsequently issued the ninth revised purchase order confirming the parties' agreement and accepting this schedule change.

70.     In Sikorsky's ninth revised purchase order, the parties agreed to a combined price of $24,721,161 for the development of the DCU and BFD.

71.     The purchase order immediately released $15.6 million, consisting of $9 million for the DCU and $6.6 million for the BFD, with the remaining funding to be released in the first quarter of 2023.

72.     The purchase order also incorporated a number of documents that together established the terms and conditions of the subcontract, including CORPDOC 3A, Lockheed Martin's Federal Acquisition Regulation ("FAR") and Defense Federal Acquisition Regulation Supplement ("DFARS") flowdown provisions.

73.     FAR and DFARS contain general terms that apply to contracts between the government and prime contractors.[2]  The flowdown provisions specify how those terms are interpreted and applied to prime contractors and subcontractors.

74.     Among other flowdown provisions, Sikorsky's ninth revised purchase order incorporated the FAR clauses for changes, FAR 52.243-1, and default, FAR 52.249-8.

---

[2]   When applying the FAR clauses, "Contractor" or "Offeror" refers to Mercury, "Government" or "United States" generally refers to Sikorsky, subject to the notes incorporating the specific FAR provision, and "Contracting Officer" generally refers to a Sikorsky Procurement Representative, again subject to the notes incorporating the specific FAR provision.

75.     Under these flowdown provisions, in a fixed-price contract for supplies and services, Sikorsky may "make changes within the general scope of [the] contract" regarding the "[d]escription of services to be performed."  FAR 52.243-1(a)(1) (Alternates I & II).

76.     However, under the constructive change doctrine, the Government (or, here, the prime contractor) is equitably obligated to pay for additional work caused by any constructive change.  Otherwise, a subcontractor would unfairly have to absorb costs caused by additional work ordered by the Government (or prime contractor).

77.     Along the same lines, the Government (or prime contractor) has an implied duty to disclose information fundamental to the preparation of estimates or contract performance, if that information is unknown to a subcontractor.

78.     Thus, if any change made by Sikorsky – including one caused by an omission or nondisclosure – increases the cost or time required to perform the contract, Mercury is entitled to an "equitable adjustment" in the "contract price, delivery schedule, or both."  FAR 52.243-1(b).

79.     Under the flowdown provisions, Sikorsky may also terminate the contract in whole or in part based on a failure to perform services within the specified time, if it provides written notice of default.  FAR 52.249-8(a)(1).

80.     However, Mercury is entitled to cure any failure within ten (10) days or more time, based on Sikorsky's agreement, upon receiving notice from Sikorsky.  FAR 52.249-8(a)(2).

81.     If the contract is terminated for default, Sikorsky must pay the contract price for the completed supplies delivered and accepted.  FAR 52.249-8(f).

82.     If, after termination, it is determined that Mercury was not in default, or that the default was excusable, Sikorsky's termination is treated as if it had been issued for convenience.  FAR 52.249-8(g).

83.     That is significant because, under a termination for convenience, Mercury is entitled to certain terminations costs, including costs incurred and profit on all work completed.  FAR 52.249-2(f).

### *Sikorsky Provided Mercury Faulty Source Code And Test Scripts*

84.     Between March and June 2022, Sikorsky delivered the legacy DCU and BFD source code to Mercury.

85.     However, when Mercury analyzed the source code Sikorsky provided and attempted to incorporate the code into the DCU and BFD development, it determined the source code was woefully deficient and could not be repurposed.

86.     The legacy source code was not compatible with the program's software needs and was missing thousands of lines of code.

87.     The problems with Sikorsky's code posed serious challenges and severely impacted the project's timing and cost.  Because complex, production-grade software for military aircraft like the one required for the DCU and BFD require a programmer to devote substantial time to write safe, efficient, and working code, it would add millions of dollars

in costs and months to the project timeline to modify and correct Sikorsky's woefully insufficient code.

88.     Sikorsky's legacy source code in fact ran "bare-metal," meaning the code interacted directly with the legacy hardware instead of an operating system, making it significantly more complex and error-prone than Mercury expected during proposal submission and contract negotiations.

89.     Because Sikorsky's code interacted directly with the legacy hardware that was being replaced, and did not sit atop a standard operating system, the code could not simply be updated to operate with the new hardware being developed (the assumption on which Mercury's proposals to Sikorsky were based).

90.     As such, retrofitting the bare-metal source code to an RTOS environment was a significantly more time-consuming and costly project than Mercury had bargained for based on Sikorsky's representations.

91.     It required Mercury to identify source code that could be reused, remove inapplicable (or noncompatible) code, and modify the code for RTOS compatibility. Mercury had to take the existing usable code and build it into a standard operating system to work with the new hardware, all while ensuring that the software met the program's requirements.

92.    All of these costly and time-consuming steps would not have been required had Mercury simply developed its own code from the ground up on a standard operating system, as Mercury included in its initial proposals.

93.    This project was made even more challenging by Sikorsky's further failure to deliver all required test scripts crucial for verifying that its software functioned as expected. Such test scripts are used by programmers to identify potential code issues early and to ensure the base code remains stable as it is added to over time.  Without a complete set of these critical test scripts, it was harder and more time consuming for Mercury to identify and understand the problems with Sikorsky's code.

94.    To cure these deficiencies – particularly to develop source code compatible with the program's software requirements – Mercury had to develop tens of thousands of lines of code, requiring over 47,000 work hours and millions of dollars in unanticipated software development costs.

95.    On September 30, 2022, Mercury submitted an updated IMS, updating the final delivery date to July 21, 2025, to account for this expanded scope of work as well as known supply chain and staffing challenges.

96.    On January 5, 2023, Sikorsky approved this change to the IMS through a disposition letter.

### *Mercury Cures Issues Identified In Sikorsky's Cure Notice*

97.     Despite Sikorsky failing to provide usable source code and agreeing to an updated schedule, Sikorsky issued Mercury a cure notice on March 27, 2023.

98.     In its notice, Sikorsky blamed the delays on staffing and supply chain issues without acknowledging or taking responsibility for its faulty code and scripts and other issues that required the parties to negotiate a new IMS in the first place.

99.     On April 21, 2023, Mercury timely responded to Sikorsky's cure notice and the parties scheduled a meeting for April 24, 2023, to discuss next steps.

100.    At that meeting, the parties agreed to establish a new IMS.

101.    Throughout May 2023, the parties held numerous meetings to discuss and refine the IMS, and on June 9, 2023, Mercury sent Sikorsky a new draft IMS.

102.    Sikorsky did not approve the June 9, 2023, draft IMS, requiring the parties to continue to discuss the IMS and the program.

103.    All the while, Mercury continued to perform under the subcontract, working to complete the critical design reviews for the DCU and BFD.

104.    On June 14, 2023, Mercury sent Sikorsky a letter requesting a release of the remaining contract funds that Sikorsky had promised to release in "Q1 of 2023."

105.    As the letter explained, Mercury had exhausted funding under the most recent purchase order, in large part because of the change in scope caused by the faulty

legacy code that was not RTOS compatible and that was not designed to meet the software requirements of the program.

106.    At the same time, as of March 1, 2023, Lockheed's prime contract (N0001922F1147) was fully funded at $43 million.

107.    Yet despite Sikorsky contractually agreeing to release the remaining funds to Mercury by March of 2023, it had failed to do so, forcing Mercury to bear the additional costs of addressing the faulty legacy code while it continued its subcontract responsibilities.

108.    On August 2, 2023, the parties met to discuss the work completed to date, the expanded project scope caused by the faulty legacy code, and the new schedule.

109.    At this meeting, Mercury explained that it had made substantial progress on the DCU and BFD projects, including the 100 formal SDRLs submitted for program milestones.

110.    Mercury also explained the significant change in scope caused by Sikorsky's faulty code.

111.    Among these unanticipated and unbudgeted changes, Mercury explained it had to rewrite a substantial portion of the source code to conform with the required RTOS and develop and/or modify the legacy test scripts.

112.    To perform these necessary tasks, Mercury estimated that it would require at least 47,000 hours in additional software development costs.

113.    As a result of these changes – as well as the previous schedule shifts caused by supply chain and staffing issues that Sikorsky already acknowledged – Mercury proposed a new schedule that extended the project end date to October 2025.

114.    On August 10, 2023, and September 7, 2023, Mercury submitted SDRLs to Sikorsky with the new IMS reflecting the changed schedule and October 2025 end date.

115.    Sikorsky approved these changes in accordance with its Statements of Work in disposition letters sent on August 29, 2023, and October 12, 2023, respectively.

116.    Sikorsky thus expressly agreed to the changes in the IMS after Sikorsky and Mercury had extensive meetings and discussions addressing the issues in the cure notice and agreeing on the path forward.

### Sikorsky's Improper Termination

117.    Following Sikorsky's disposition letters, Mercury performed according to the updated IMS and in line with the new schedule.

118.    Mercury held a two-day critical design review with Sikorsky for the BFD on November 14 and 15, 2023.  Mercury completed the first day of the critical design review without Sikorsky raising material issues about Mercury's performance, and Mercury prepared for the second day of the critical design review that Mercury expected to culminate with Sikorsky's approval of the design and a million dollar plus milestone payment to Mercury.

119.    Even though the parties negotiated and agreed to a new, updated IMS, and even though Mercury was continuing to perform under that schedule for months after the parties discussed the program's issues, Sikorsky nevertheless issued Mercury a termination for default on November 15, 2023 – more than *seven months* after the initial cure notice and mid-way through the critical design review for the BFD.

120.    As basis for termination, Sikorsky identified only Mercury's alleged failure to cure the issues in its earlier cure notice.

121.    Mercury responded to this termination letter on December 15, 2023, explaining that termination was improper because it had cured the earlier-identified issues and that, in addition to expressly agreeing to a new IMS, Sikorsky waived its right to terminate by allowing Mercury to continue to perform and incur substantial costs for over *seven months*.

122.    At the time of Sikorsky's purported termination, Mercury had indeed already delivered on a number of key project milestones.  Both the DCU and BFD had obtained preliminary design approval and the DCU successfully completed critical design review. The two-day critical design review for the BFD was in progress and scheduled to be completed the same day Sikorsky improperly terminated the agreement.

123.    By this point, Mercury had incurred project costs of more than $22 million, yet Sikorsky had only paid it $8 million.

124.    Mercury has repeatedly sought to resolve this matter informally and obtain payment from Sikorsky for costs properly incurred in performing its obligations under the subcontract, but to no avail.

125.    But Sikorsky has refused to pay for the work Mercury performed.

126.    As a last resort, Mercury again sought to settle this matter with Sikorsky in good faith before filing this complaint, but Sikorsky, again, refused to engage or commit to pay what it owes Mercury.

## COUNT I
### (Breach of Contract: Improper Termination for Default)

127.    Mercury repeats and incorporates the allegations in Paragraphs 1 to 126 as if set forth fully herein.

128.    Following Sikorsky's solicitation and Mercury's proposals, Sikorsky issued to Mercury Purchase Order No. 4500658457, along with a series of revisions to Purchase Order No. 4500658457, under which Mercury agreed to provide Sikorsky with the DCU and BFD for the CH-53K Aircraft Program.

129.    The purchase order incorporated a number of documents, including Lockheed Martin's FAR flowdown provisions.

130.    Under the flowdown provisions, Sikorsky may only terminate for default if it provides written notice of default and Mercury fails to cure the failure within the time allowed.  FAR 52.249-8(a)(1)–(2).

131. If Sikorsky improperly terminates for default, or the default was excusable, the termination is treated as if it had been issued for convenience. FAR 52.249-8(g).

132. Under termination for convenience, Mercury is entitled to certain termination costs, including costs incurred and profit on all work performed. FAR 52.249-2(f).

133. Mercury diligently performed its obligations under the parties' agreements, including obtaining preliminary and critical design approvals for the DCU, preliminary design approval for the BFD, and delivering approximately 100 formal SDRLs for program milestone events.

134. Despite these efforts, Sikorsky breached its obligations by improperly terminating the contract for default and asserting Mercury failed to cure even though it had addressed the issues Sikorsky had identified, negotiated a new IMS (which Sikorsky agreed to) toward that end, and had been dutifully performing under the new schedule and scope of work. Sikorsky terminated the contract mid-way through the critical design review that would have resulted in a payment of more than $1 million to Mercury.

135. Sikorsky waived any right to terminate the contract for default based on its original cure notice by agreeing to a schedule extension under an updated IMS and permitting Mercury to perform for over seven months after its notice.

136. Accordingly, Sikorsky acted in bad faith and breached its obligations under the parties' agreements and improperly terminated the contract for default.

-24-

137. As such, Sikorsky's termination for default is properly treated as a termination for convenience.

138. Mercury has suffered and continues to suffer ongoing harm as a result of Sikorsky's breach and is entitled to compensation following its termination for convenience.

139. Mercury is entitled to damages from Sikorsky, including recovery of more than $14 million in costs it had incurred at the time of termination, as well as any and all other relief under federal and Connecticut law.

## COUNT II
**(Breach of Contract: Failure to Provide Required Source Code and Test Scripts)**

140. Mercury repeats and incorporates the allegations in Paragraphs 1 to 126 as if set forth fully herein.

141. Following Sikorsky's solicitation and Mercury's proposals, Sikorsky issued to Mercury Purchase Order No. 4500658457, along with a series of revisions to Purchase Order No. 4500658457, under which Mercury agreed to provide Sikorsky with the DCU and BFD for the CH-53K Aircraft Program.

142. The parties' agreements assumed Sikorsky would provide Mercury with usable legacy source code for the DCU and BFD projects, the source code would be compatible with an RTOS, and that Sikorsky would provide test scripts adequate for testing the software.

143. Critically, in its March 21, 2022, letter Sikorsky expressly opted for the scope of work that *did not* include Option 10b for Mercury to develop new source code for

the project.  In doing so, Sikorsky necessarily represented that it had and would provide Mercury with source code that was RTOS compatible and would meet the software requirements for the program.

144.    In selecting this scope of work, Sikorsky was obligated to provide legacy source code for the DCU and BFD that was RTOS compatible and would meet the software requirements for the program.

145.    Sikorsky breached the parties' agreements by providing faulty bare metal legacy source code that was missing over 14,000 lines of required code, was not RTOS compatible, did not meet the needs of the program, and lacked crucial test scripts.

146.    Prior to entering the agreement, Sikorsky possessed the source code and could and should have known it was bare metal, not compatible with an RTOS, and not able to meet the requirements for the program.

147.    Sikorsky also could and should have known that making its code RTOS compatible and meeting the software requirements for the program would drastically increase the time and costs necessary to complete the project.

148.    Yet, Sikorsky, acting in bad faith, failed to disclose the true state of the source code leading to Mercury underbidding the time and expense to repurpose the existing source code for the DCU and BFD.

149.    Sikorsky's breaches and misrepresentations have caused Mercury to suffer substantial harm.

150. Mercury is therefore entitled to damages from Sikorsky, including the costs it incurred to develop usable code and test scripts, as well as all other relief under federal and Connecticut law.

## COUNT III
### (Breach of Contract: Constructive Change)

151. Mercury repeats and incorporates the allegations in Paragraphs 1 to 126 as if set forth fully herein.

152. Following Sikorsky's solicitation and Mercury's proposals, Sikorsky issued to Mercury Purchase Order No. 4500658457, along with a series of revisions to Purchase Order No. 4500658457, under which Mercury agreed to provide Sikorsky with the DCU and BFD for the CH-53K Aircraft Program.

153. Sikorsky's purchase order incorporated a number of documents, including Lockheed Martin's FAR flowdown provisions.

154. Under the FAR fixed-price changes provision, Mercury is entitled to an "equitable adjustment" in the "contract price, delivery schedule, or both" for any changes that Sikorsky makes to the project scope. FAR 52.243-1(b).

155. Sikorsky was obligated to provide source code compatible with a RTOS and test scripts to adequately test the software but failed to deliver either compatible source code or adequate test scripts as required.

156. As a result, Mercury had to perform substantial additional work to develop usable source code and test scripts based on Sikorsky's breaches and misrepresentations.

-27-

157. Indeed, unbeknownst to Mercury, Sikorsky knew or should have known its source code was bare metal and was not RTOS compatible and that making it compatible with an RTOS would drastically increase the time and expense to complete the project.

158. Mercury neither knew nor should have known that Sikorsky's source code was faulty given that the parties' agreements assumed that it was usable, and Sikorsky affirmatively agreed to provide the necessary source code as part of the bid process.

159. By failing to disclose these facts to Mercury, Sikorsky acted in bad faith and led Mercury to underbid the project based on the true scope of work that would be required.

160. As a result, Mercury had to perform substantial additional work to redevelop usable source code and test scripts.

161. Mercury notified Sikorsky of the deficient code and provided Sikorsky with an updated schedule and cost estimates.

162. Sikorsky approved the schedule and cost estimates and pushed Mercury to resolve the source code issue.

163. Accordingly, Sikorsky expressly altered the scope of work, and Mercury is entitled to an equitable adjustment for the additional time spent redeveloping the source code and test scripts.

164. Mercury is entitled to damages from Sikorsky, including the development costs it incurred to address Sikorsky's faulty source code and test scripts, as well as all other relief provided under federal and Connecticut law.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

165. Mercury repeats and incorporates the allegations in Paragraphs 1 to 126 as if set forth fully herein.

166. Following Sikorsky's solicitation and Mercury's proposals, Sikorsky issued to Mercury Purchase Order No. 4500658457, along with a series of revisions to Purchase Order No. 4500658457, under which Mercury agreed to provide Sikorsky with the DCU and BFD for the CH-53K Aircraft Program.

167. Sikorsky owed Mercury a duty of good faith and fair dealing from the time the parties initially executed the purchase order.

168. Sikorsky breached its contract with Mercury.

169. Sikorsky breached the duty of good faith and fair dealing by:

- Terminating the purchase orders for default after inducing Mercury to spend tens of millions of dollars to perform under the parties' agreement, and when Mercury was just days away from completing milestones that would have obligated Sikorsky to make significant payments to Mercury;

- Agreeing to a new schedule and enticing Mercury to perform additional work for *seven months* after it issued its cure notice, while Sikorsky appeared to have plans to terminate Mercury for default and wanted Mercury to keep working until Sikorsky identified an alternative supplier;

- Refusing to release $9 million of Mercury's contract (about $24 million total), despite promising to release those funds in "Q1 of 2023," and even though as of March 1, 2023, Lockheed's prime contract (N0001922F1147) was fully funded at $43 million;

- Intentionally or recklessly selecting the option to reuse source code during definitization of the parties' agreement, knowing its bare metal source code was not suitable for Mercury's intended purpose;

- Failing to disclose its superior knowledge that the source code was not RTOS compatible and either intentionally or recklessly not disclosing that updating the code to make it compatible with an RTOS would substantially increase the time and cost to complete the project; and

- Intentionally or recklessly inducing Mercury to significantly underbid the amount of work required to develop required source code.

170. Mercury is entitled to damages from Sikorsky as well as all other relief provided under Connecticut law.

### COUNT V
### (Unjust Enrichment)

171. Mercury repeats and incorporates the allegations in Paragraphs 1 to 126 as if set forth fully herein.

172. Mercury has conferred substantial non-gratuitous benefits on Sikorsky and Sikorsky has been enriched by those benefits.

173.    Mercury provided substantial benefits to Sikorsky based on the work it completed on the DCU and BFD projects, as evidenced by the 100 formal SDRLs submitted for program milestones.

174.    Mercury incurred project costs of more than $22 million, yet Sikorsky has paid it only $8 million.

175.    As a result, Sikorsky has been enriched by at least $14 million.

176.    Sikorsky knowingly accepted and retained the benefits conferred onto it by Mercury and was aware that Mercury was not providing those benefits gratuitously.

177.    Sikorsky's enrichment was improper and at Mercury's expense.

178.    Equity and good conscience require Sikorsky to compensate Mercury for the substantial benefits Mercury conferred on Sikorsky.

179.    Mercury is entitled to damages as well as all other relief provided under Connecticut law.

## COUNT VI
### (Quantum Meruit)

180.    Mercury repeats and incorporates the allegations in Paragraphs 1 to 126 as if set forth fully herein.

181.    An implied contract for services existed between Mercury and Sikorsky.

182.    Sikorsky requested that Mercury perform work on the DCU and BFD projects with the promise that Mercury would be paid for the work it performed.

183.     Based on that promise, Mercury provided substantial benefits to Sikorsky for the work it completed on the DCU and BFD projects, as evidenced by the 100 formal SDRLs submitted for program milestones.

184.     Mercury incurred project costs of more than $22 million for this work, yet Sikorsky has paid it only $8 million.

185.     Sikorsky promised to pay Mercury for all of the work that it performed.

186.     Yet, Sikorsky has failed to pay Mercury at least $14 million for the work that it performed.

187.     Equity and good conscience require Sikorsky to compensate Mercury for the services provided by Mercury to Sikorsky.

188.     Mercury is entitled to damages as well as all other relief provided under Connecticut law.

**PRAYER FOR RELIEF**

WHEREFORE, Mercury requests the Court enter judgement against Defendants, granting the following relief:

- Compensatory damages in an amount to be proven at trial;

- Punitive damages;

- Attorney's fees and costs;

- Pre-judgment and post-judgment interest and other interest on all monetary damages, as permitted by law; and

- Any and all such further relief that the court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mercury demands a

trial by jury in this action on all issues so triable as of right.

Dated: June 11, 2026

/s/ Lindsay Stone

Lindsay Stone (Bar No. 438667)
Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, N.Y. 10112
Telephone: 212-653-8184
Facsimile: 917-438-6134
lstone@sheppard.com

Paul Werner (*pro hac vice* to be submitted)
Townsend Bourne (*pro hac vice* to be submitted)
Hannah Wigger (*pro hac vice* to be submitted)
Ryan D'Ercole (*pro hac vice* to be submitted)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppard.com
tborne@sheppard.com
hwigger@sheppard.com
ryandercole@sheppard.com

*Attorneys for Plaintiff Mercury Mission Systems, LLC*